

# In the
# Missouri Court of Appeals
## Western District

STATE OF MISSOURI,

        **Respondent,**

v.

CEDRICK OLIVER RUSSELL,

        **Appellant.**

**WD84644**

**OPINION FILED:**

**DECEMBER 13, 2022**

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Kevin D. Harrell, Judge**

**Before Division Three: Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge,
Anthony Rex Gabbert, Judge**

Cedrick Russell appeals his conviction following jury trial in the Jackson County Circuit Court for first degree murder, first degree sodomy, second degree burglary, stealing, first degree tampering, and tampering with physical evidence. He argues in six points on appeal that the trial court erred in failing to strike a jury member, excluding the public from voir dire, failing to grant a mistrial, submitting the stealing count, failing to grant an acquittal, and in the sentence given for sodomy. The judgment is affirmed as corrected.

## Facts

On July 28, 2017, Cedrick Russell was indicted for first degree murder, first degree sodomy, first degree burglary, felony stealing, first degree tampering with a motor vehicle, and

tampering with physical evidence. In the light most favorable to the verdict, *State v. Phillips*, 633 S.W.3d 891, 894 (Mo. App. W.D. 2021), the following evidence was presented at trial in March 2021:

Russell lived next door to the victim ("Victim"[1]). On May 31, 2017, sometime after midnight, he entered the Victim's kitchen window, leaving his fingerprints on the exterior side. Russell attacked and sodomized Victim. He then strangled her to death. Russell's DNA was found in sperm left on wadded up paper towels found next to Victim's bed and in a rectal swab taken from Victim.

Russell ransacked Victim's bedroom and stole at least four items of jewelry and Victim's cell phone. His fingerprints were found on a jewelry box in Victim's bedroom. Russell then stole Victim's automobile.

At 3:14 a.m., Russell conducted a map search on his phone for an apartment complex in Raytown, Missouri. Victim's car was eventually found near there. It had vomit on the front fender that was similar to vomit found in Victim's bedroom and bathroom.

On June 2, 2017, Victim's body was found. That same day, Russell used his cell phone to search for a pawn shop. He was subsequently recorded on video pawning Victim's jewelry at that pawn shop.

On June 6, 2017, Russell changed his cell phone number. He drove around various locations in the Kansas City area with Victim's cell phone from May 31 to June 8, 2017. The evidence showed that Russell drove to his girlfriend's address on the morning of the murder with Victim's cell phone. Victim's cell phone was never recovered.

---

[1] We refer to Russell's victim using the generic term "Victim" in order to protect her privacy. *See* § 595.226.1, RSMo 2016.

2

Victim's last cell phone call was with her boyfriend and ended at 12:10 a.m. the morning of her murder. Russell's cell phone came from the area where Victim's car was later found and moved into an area that included the crime scene at 12:15 a.m. the morning of the murder. Victim did not answer a call from her best friend at 1:37 a.m.

Russell did not testify and did not call any witnesses in his defense. The jury found Russell guilty of first-degree murder, first-degree sodomy, second-degree burglary, first-degree tampering, misdemeanor stealing, and tampering with physical evidence. He was sentenced on June 24, 2021 as a prior felony offender to life imprisonment without parole for murder, life imprisonment for sodomy, seven years for burglary, seven years for tampering with Victim's automobile, four years for tampering with physical evidence, and one year for misdemeanor stealing. The sentences for the latter four crimes were ordered to run concurrently with one another but consecutively to the sentences for murder and sodomy which were ordered to run consecutively to one another.

The appeal follows.

**Point I**

In his first point on appeal, Russell argues the trial court abused its discretion in failing to strike a juror for cause. He states that Juror 14 was not qualified because her ability to be impartial was questionable. Russell maintains that Juror 14 never unequivocally stated that she would not draw any inference of guilt from the defendant's failure to testify.

"A trial court has wide discretion in determining the qualifications of members of the venire, and on appeal the court will not disturb the trial court's ruling on a challenge for cause absent a clear abuse of discretion and a real probability of injury to the complaining party." *State v. Savage*, 609 S.W.3d 71, 83 (Mo. App. W.D. 2020) (internal quotation marks omitted). "Because the trial court is in a better position to determine a venireman's ability to impartially follow the

3

law, doubts as to the trial court's findings will be resolved in its favor." *Id*. (internal quotation marks omitted). "[D]enial by a trial court of a legitimate request by an accused to excuse for cause a partial or prejudiced venireperson constitutes reversible error." *Id*. (internal quotation marks omitted). "A legitimate challenge is made where it clearly appears from the evidence that the venireperson is prejudiced and, as a result, cannot be fair and impartial." *Id*. (internal quotation marks omitted).

"Whether a prospective juror is prejudiced and cannot be fair and impartial must be determined on the basis of the entire examination and not just a single response." *Id*. (internal quotation marks omitted). "[W]hen the examination leaves uncertainty about the venireperson's ability to be fair and impartial, the trial court has a duty to make an independent inquiry regarding fitness for jury service." *Id*. (internal quotation marks omitted). "The critical question on a challenge for cause is whether the venireperson unequivocally indicated an ability to evaluate the evidence fairly and impartially." *Id*. (internal quotation marks omitted). "Where a venireperson's answer suggests a possibility of bias, that person is not qualified to serve as a juror unless, upon further questioning, he or she is rehabilitated by giving unequivocal assurances of impartiality." *Id*. at 84 (internal quotation marks omitted). "A venireperson who expresses a bias against a defendant for exercising his Fifth Amendment right not to testify is not considered fair and impartial, making him subject to being struck for cause … unless the potential juror is thereafter rehabilitated." *Id*. (internal quotation marks and citations omitted). The "rehabilitation of a prospective juror must be responsive to the indication of partiality and provide a clear, unequivocal assurance that the juror would not be partial." *Id*. (internal quotation marks omitted).

The trial court limited voir dire to one hour and twenty minutes for each side. Defense counsel argued that this time was not sufficient given the serious nature of the charges. During

voir dire, defense counsel asked the panel questions regarding the defendant's right not to testify and whether any member would have difficulty following the law that no presumption of guilt may be drawn from a defendant's failure to testify. No venireperson responded. After questioning, the panel was sent home and told that those chosen for the jury would later be notified.

The next morning, the trial court informed the parties that when Juror 14 was notified she would serve on the jury, she said she wished defense counsel would have asked an additional question at the end. She said that as she thought about it, she got more concerned about the defendant not taking the stand. Juror 14 was brought into the courtroom and the following occurred:

> THE COURT: Do you mind telling me what you shared with Mr. Smith.
>
> JUROR NO. 14: The --- later on, you know how when [defense counsel] presented the thing about the gentleman not testifying and stuff, that kind of bothered me because I wouldn't even have thought that that wasn't a possibility and it just kept brewing in my mind. It's like, well, why doesn't he have to? I know it's the law, but I never thought that he wouldn't. And that would always just be in the back of my mind; if he was questioned about something, what would his answers be.
> …
> THE COURT: So the question is – the law is he doesn't have to, as Mr. Berrigan told you that. And if he did not and the law is that, would you hold that against him?
>
> JUROR NO. 14: No. Because that's right. But I just never thought that was a possibility, you know.
>
> THE COURT: All right. But given the fact that is a possibility, and that is the law –
>
> JUROR NO. 14: Uh-huh.
>
> THE COURT: -- are you able to sit in this case, hear the evidence, give him the presumption of innocence knowing that that's a possibility, and wipe that totally out of your head because he has that right?
>
> JUROR NO. 14: Yes. The longer I thought about it yesterday, I'm like, just put it aside. You know, just put yourself just in the courtroom and don't think about anything else.

5

THE COURT: Okay. So as you stand here this morning, knowing that that is the law, knowing that he's presumed innocent, knowing that he does not have to testify, where does that put you?

JUROR NO. 14: I presume he's innocent until I know – until I find out otherwise. …

PROSECUTOR: I just want to make sure that I'm clear…. so your question or concern was not understanding why he didn't have to testify and you might not get that answer?

JUROR NO. 14: Right.

PROSECUTOR: But what I'm hearing from you is that since that is the law, since that is the instruction and if the court instructs you that way, that's not going to be a thing that you consider, you'll follow the instructions of the court?

JUROR NO. 14: I can follow the instructions of the court.

DEFENSE COUNSEL: What I understood … this concept about not testifying on a case in which he's charged with first degree murder.

JUROR NO. 14: Uh-huh.

DEFENSE COUNSEL: When you thought about it, that troubled you enough to call, or I'm sorry. Mr. Smith [the clerk] called you, to tell him during the call, hey, I've got a problem; is that fair?

JUROR NO. 14: That is fair.

DEFENSE COUNSEL: Okay. I wrote this down just a moment ago: I know it's the law, but that would just be in the back of my mind.

JUROR NO. 14: No. I mean I know it's the law, but there's nothing we can do about changing the law, so I have to put it out of my mind and don't even present that in my mind. I just would have to put it out of my mind; not even think about that.

DEFENSE COUNSEL: It's kind of like I asked yesterday. That is kind of what the law says.

JUROR NO. 14: Uh-huh.

DEFENSE COUNSEL: But sometimes we don't always agree with every single thing about the law, which is –

JUROR NO. 14: Sure.

DEFENSE COUNSEL: – fine. So if this is kind of in the back of your mind, you could see how I might be concerned about that.

JUROR NO. 14: I can see that.

DEFENSE COUNSEL: I know you told the judge, well, I can be fair. I can listen to the evidence and make a decision.

JUROR NO. 14: Uh-huh.

DEFENSE COUNSEL: But if [Defendant] does not testify, and frankly, that's – we're anticipating he won't, are you a hundred percent confident that in the back of your mind you're not going to be wondering why? Why isn't he testifying?

JUROR NO. 14: No.

DEFENSE COUNSEL: No.

THE COURT: Well, let's get a clarification on that. He asked you were you a hundred percent confident. You said no. So I want to make sure we're on the same page with that answer because that could be looked at two ways.

JUROR NO. 14: Okay.

THE COURT: Are you a hundred percent that you can, yes, I am or no, I can't?

JUROR NO. 14: Put it out my mind?

THE COURT: Yes.

JUROR NO. 14: Yes, I can put it out of my mind. You can't change anything.

THE COURT: So you are a hundred percent sure that you can put that out of your mind?

JUROR NO. 14: Yes.

THE COURT: Follow the court's instructions?

JUROR NO. 14: Yes.

THE COURT: Knowing that that is the law?

JUROR NO. 14: Yes.

Defense counsel moved to strike Juror 14 for cause. The trial court overruled the motion, and Juror 14 served on the jury. Russell did not testify at trial.

On appeal, Russell attaches significance to the fact that Juror 14 was so worried about the defendant not testifying that she raised the concern about the defendant not testifying herself when notified she would be serving on the jury. Russell also claims that Juror 14 never unequivocally stated that she would not draw any inference of guilt from defendant's failure to testify. He maintains that Juror 14 was not sufficiently rehabilitated.

We disagree. Juror 14 never stated a belief that an innocent person would testify. Instead, she stated she assumed the defendant would testify and was confused about why he would not. Juror 14 stated that she was one hundred percent certain that she could put the defendant's decision to not testify out of her mind and follow the court's instructions. She also stated that she would presume the defendant was innocent unless proven otherwise. Looking at the entire examination, we find that Juror 14 was rehabilitated and provided clear, unequivocal assurance that she would not be partial. *See id*. (juror was rehabilitated where the juror "clearly stated that they could serve impartially and without bias, notwithstanding a hope and desire that [the defendant] would testify"); *contrast State v. Wilson*, 998 S.W.2d 202, 206 (Mo. App. W.D. 1999) (where juror stated he would infer guilt or be affected if the defendant failed to testify, merely having the juror agree to follow the court's instructions was insufficient rehabilitation); *contrast State v. Stewart*, 692 S.W.2d 295, 299 (Mo. banc 1985) (juror was not rehabilitated where she never abandoned her belief that an innocent man would testify in his own defense).

8

The point is denied.

**Point II**

In his second point on appeal, Russell argues that the trial court erred in effectively excluding the public from voir dire. He states that the seats were taped off, the doors were closed, and live streaming to the public was not available. Russell claims that this is a structural error that requires reversal.

"In all criminal prosecutions, defendants have a constitutional right to a public trial." *State v. Jones*, 530 S.W.3d 525, 529 (Mo. App. E.D. 2017). "The Supreme Court of the United States has deemed it well settled that "the Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors." *Id.* (internal quotation marks omitted). "Whether a defendant's right to a public trial has been violated is a question of law subject to *de novo* review." *Id.* at 530 (internal quotation marks omitted).

"The Sixth Amendment right to a public trial, however, is not absolute." *Id.* "After ensur[ing] the proper balance between competing interests[,] a trial court may close the courtroom under exigent circumstances." *Id.* (internal quotation marks omitted).

> To constitutionally justify the closure of any portion of a trial, the United State Supreme Court has enumerated four factors the trial court must contemplate, upon objection, prior to constraining public access:
> 1) an overriding interest that is likely to be prejudiced by a public proceeding must be stated;
> 2) the closure must be no broader than necessary to protect that interest;
> 3) the trial court must consider reasonable alternatives to closing the proceeding; and
> 4) it must make findings adequate to support the closure.

*Id.* (internal quotation marks omitted). "Notwithstanding the autonomy afforded to trial courts to deny the public access to trial proceedings under limited circumstances, trial closures, including restrictions upon the public to observe voir dire, are to be rare and only for cause shown that

9

outweighs the value of openness." *Id*. (internal quotation marks omitted). "Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Id*. (internal quotation marks omitted). "In fact, trial courts are required to, *sua sponte*, consider [and reject] alternatives to closure even when they are not offered by the parties." *Id*. (internal quotation marks omitted).

"Violations of a defendant's Sixth Amendment right to a public trial at the voir dire phase is structural error that requires no showing of prejudice." *Id*. (internal quotation marks omitted). "If a trial court fails to adhere to the procedures set forth [above], any intentional closure is deemed unjustified and will, in all but the rarest of cases, require reversal." *Id*. at 531. "[A]lthough an infringement upon a defendant's Sixth Amendment right to a public trial is structural error, a public trial violation does not render a trial fundamentally unfair in every case." *Id*. (internal quotation marks omitted).

This trial occurred in March 2021 during the Covid-19 pandemic while social distancing protocols were in place. The day before voir dire began, the prosecutor asked if the trial could be broadcast to another room for viewing. The trial court indicated that the proceedings would not be broadcast to another room. Defense counsel asserted that Mr. Russell was entitled to a public trial and expressed a concern about the proceedings not being broadcast. The trial court stated that the entire courtroom would be used, that procedures were in effect to prevent mingling with prospective jurors, and that the courtroom was open. On the morning of voir dire, the State of Missouri ("the State") filed a motion for live streaming. The defense agreed with the motion. The trial court stated that the motion would be considered and "as I stated yesterday, the courtroom is open and we will do our best to make this available … for individuals to view"

10

After voir dire, defense counsel stated that after they had asked for a break, defense counsel noticed Russell's sister, Tamika Jackson, and friend, Richard Nelson, in the hallway. Defense counsel asked them if they were able to enter the jury room, and they said that they were not able to do so. Defense counsel stated that he was under the impression that the main doors were shut and locked and they were physically prevented from coming in the closed doors. Defense counsel asserted that Russell's right to a public trial had been violated and asked for a mistrial. The trial court denied the request for mistrial and stated that "the courts are open and the court is going to do everything in its power to follow the Covid-19 process and allow the courtroom to remain open."

Russell raised the motion of a public trial in his motion for new trial. At the motion for new trial proceeding, which occurred over the course of two days, the following evidence was presented with respect to whether the courtroom was closed to the public. Charity Johnston, an investigator for the public defender's office, testified that double doors were open on the day she investigated. That was not the day of voir dire in Russell's case. When she shut the doors, she found that they were able to open back up and did not lock.

Tracy Smedley, the jury supervisor and deputy court administrator, testified that prior to the pandemic, over 200 people could fit in the jury assembly room being used for voir dire. Using a six-foot social distancing radius, the room could accommodate 49 people. Some of these seats may not have been available due to the need to distance from counsel tables which were added in front. Thirty-five venirepersons were seated for voir dire in Russell's case. Seats were marked to designate where each of the 35 venirepersons would sit. Some of the chairs in the room were pushed up against each other or marked off with tape. Smedley testified that while "the doors are closed when we begin [jury] selection" to keep out noise, "they're not locked."

11

Cathy Moseley, a jury specialist at the Independence courthouse where the selection took place, testified that the east or back doors are available to the public to come in and out of the jury assembly room. Only the south doors required an employee badge to scan for admission. Moseley was present for jury selection in this case and did not receive any phone calls or complaints that anyone was denied access. She did not lock the back doors on March 29, they were not locked, and as far as she knew, "they don't lock at all."

Richard Nelson testified that he came to the Independence courthouse on March 30, 2021, at about 10:30 a.m. to watch the jury selection process of Russell's trial. After he went through courthouse security, the court was beginning to go back in session after a recess. People, who had on jury stickers, were headed back into the jury assembly room. Tamika Jackson arrived, and Nelson went out of the courthouse to meet her. They came into the courthouse together. About ten minutes had passed since Nelson's first entry into the courthouse.

After Nelson and Jackson went through security, the courtroom doors were closed. There was a sign on the door, which gave him the impression that he was not to enter the courtroom. Nelson could not recall what the sign said. The sign in photographs taken by the defense stated "Quiet. Court in session." Nelson could not remember if that was the sign he saw. He did not try to see if the doors would open and did not go in the room. Nelson was dissuaded from entering the courtroom due to the closed doors and the sign. Nelson testified that he saw the doors closed but that he "never tried those doors" to see if they would open.

Michael Hill, Missouri State Public Defender Attorney, testified that on the morning of March 30, 2021, he arrived at the Independence Courthouse between 10:30 and 11 a.m. to watch voir dire in Russell's case. He was asked to come by defense counsel to see if he could get in and to verify that the proceedings would be open to the public. He entered the jury assembly room

through the main doors used by the public and opened the left door because it was slightly ajar. The right door was completely closed. There was a sign on the door, but he did not remember if it said "Quiet. Court In Session." Hill stated that "it looked like the normal hallway of the courthouse." When asked why the sign did not deter him from entering, he testified: "… my goal was to, if I could go in, was to enter and sit down and see what happened" because defense counsel had asked him to do so. His recollection "was that the feeling I had approaching the door was I would not have opened it if I didn't know what was happening behind the door" After he entered the courtroom, he saw the taped-off seats. He noticed a folding chair or hard plastic chair in the back, and sat down. The defense was engaged in its voir dire. He did not recall any other persons seated in any folding chairs or chair similar to the chair he sat in. He believed that all of the other people in the jury assembly room were venire members, court staff, attorneys, and the defendant. Hill did not see anyone else try to enter the room. He agreed that it was "a fair statement" to say that he was "there really in [his] capacity as a member of the public[.]"

The prosecutor argued that the court "was there that day" and "repeatedly told defense that the room was open to the public and the only evidence heard in the course of these long proceedings is that the person who tried [to] open the door who's testified before this court [got] in and [sat] down." In addition, Juror 3 had returned late through the doors following a break, which further established that they were not locked.

The trial court stated that it had carefully reviewed the evidence from both days of the hearing and denied the motion for a new trial. We do not find this to be error. The only two people who claim to have been excluded from the courtroom never tried to open the courtroom doors. Much was made during the proceeding regarding the motion for new trial about how the jury room was configured, what chairs were taped off, and whether the public would know that seats were

13

available for the public to sit in to watch the proceedings. None of those details are relevant here where Nelson and Jackson did not attempt to open the door. The only evidence regarding a sign on the door suggests that the sign stated "Quiet. Court in session." No evidence was presented that the sign or anything present in the hallway indicated that the public was not permitted to open the doors and walk inside. The doors were unlocked, and at least one other person used them to enter the room once voir dire had begun.

There was no evidence that the courtroom was closed, that the supposed closure was enforced, or that someone was actually excluded from the courtroom. Russell was not deprived of the protections of a public trial. See *id.* ("Defendant offers no evidence that the trial, itself, was not open to the general public and the press at all times. The record does not suggest Defendant, his family, his friends, or any witnesses were improperly excluded."). "Any infringement upon Defendant's right to a public trial was trivial." *Id*. "Assuming, *arguendo*, there was, indeed, a violation of Defendant's Sixth Amendment right to a public trial, said violation does not rise to the level of "structural error" under the most recent Supreme Court precedent." *Id*.

The point is denied.

**Point III**

In his third point on appeal, Russell argues that the trial court abused its discretion in failing to grant his motion for a mistrial. He states that the law enforcement officer told the jury that the Career Criminal Squad sought Russell's apprehension and this testimony suggested that Russell was a career criminal and had been habitually engaged in criminal activity. Russell claims this had a decisive role in the jury's determination of guilt.

"It is well-settled law in Missouri that, subject to a number of limited exceptions, evidence of prior criminal acts is not admissible in a trial against a criminal defendant." *State v. Eaton*, 563

14

S.W.3d 841, 844 (Mo. App. E.D. 2018). "The rationale underlying this rule is grounded in the view that evidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted." *Id.* (internal quotation marks omitted). "While a mistrial is a potential remedy for the introduction of inadmissible testimony, it is not the preferred one." *Id.* "A mistrial is a drastic remedy to be exercised only in those extraordinary circumstances in which the prejudice to the defendant cannot otherwise be removed." *Id.* (internal quotation marks omitted).

> When evaluating the prejudicial effect of *uninvited* references to other crimes, the Missouri Supreme Court has articulated five factors for appellate courts to consider: (1) whether the statement was voluntary and unresponsive to the prosecutor's questioning, or caused by the prosecutor; (2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecutor; (3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; (4) whether the court promptly sustained defense counsel's objection to the statement and instructed the jury to disregard the statement; and (5) whether it appears the statement played a decisive role in the determination of guilt.

*Id.* at 845 (emphasis in original).

During the trial, Officer Evans testified as follows:

PROSECUTOR: Now, in your role at the Kansas City Missouri Police Department in June of 2017, specifically June 13th of 2017, were you informed that the homicide squad was looking for a suspect named Cedrick Russell?

OFFICER EVANS: Yes.

PROSECUTOR: And were you provided a Facebook profile link that was presumed to be associated with Mr. Russell?

OFFICER EVANS: Yes.

PROSECUTOR: And what was the purpose of the squad providing you with that profile?

15

OFFICER EVANS: *It was actually Sergeant Greenwell the career criminal squad.* He had approached me asking if I could contact Mr. Russell via Facebook Messenger in order to apprehend him for a homicide warrant.

Russell now complains about the italicized sentence.

Defense counsel waited until the conclusion of Officer Evans' testimony to ask for a mistrial. Defense counsel stated he did not object during the testimony because he did not want to draw attention to it. When asked if he wanted a remedy other than mistrial, defense counsel stated that no other remedy would cure the prejudice.

"We review the trial court's refusal to grant a mistrial for abuse of discretion." *Id*. at 844. "The ruling on a request for a mistrial is left to the sound discretion of the trial court because it is in the best position to observe the impact of the problematic incident." *Id*. (internal quotation marks omitted). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before it and when the ruling is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." *Id*. (internal quotation marks omitted).

However, "[f]ailure to object at the earliest opportunity to the admission of evidence constitutes a waiver of the claim." *State v. Borden*, 605 S.W.2d 88, 90 (Mo. banc 1980). Instead of objecting immediately after the complained about testimony, defense counsel waited until the witness was done testifying and then sought a mistrial. The State argues on appeal that the only available review is for plain error under Rule 30.20. Rule 30.20 provides, in pertinent part, that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Russell argues that he "objected and moved for a mistrial as soon as possible after the prejudicial remark."

16

Even if the applicable standard of review is for abuse of discretion, we find no error here. With respect to the five factors identified above, defense counsel agreed the statement was not caused by the prosecutor. It was singular and isolated. The reference to career criminal squad did not make specific reference to crimes committed by Russell. The court did not promptly sustain defense counsel's objection and instruct the jury to disregard because no such objection or request was made. Finally, as set forth in the facts section, there was a significant amount of evidence establishing Russell's guilt. The one sentence complained about in this point did not play a decisive role in the determination of Russell's guilt. "Applying the five factors …, we find [the] reference to prior criminal acts did not create such prejudice that only a mistrial could remedy it." *Id*. at 846.

The point is denied.

**Point IV**

In his fourth point on appeal, Russell argues the trial court erred in submitting Count IV which was for the misdemeanor stealing to the jury. He states that the trial court sustained his motion for judgment of acquittal for both felony and misdemeanor stealing under Count IV. Russell argues further that the trial court violated the double jeopardy clause by submitting the misdemeanor stealing to the jury. He claims this court must reverse or vacate the conviction and sentence for that count.

"Whether or not the circuit court violated [the defendant's] right to be free from double jeopardy, protected by the Fifth Amendment to the United States Constitution, is a question of law, which this court reviews *de novo*." *State v. Glasgow*, 250 S.W.3d 812, 813 (Mo. App. W.D. 2008). "The Fifth Amendment protects against a second prosecution for the same offense after acquittal." *Id*. (internal quotation marks omitted). "In determining whether or not a double jeopardy violation

17

occurred, we examine the substance of the circuit court's ruling, rather than its form, to determine the precise nature of the ruling." *Id.*

Russell was charged in Count IV with class D felony of stealing, section 570.030.[2] Specifically, the State alleged that on May 31, 2017, Russell stole Victim's "rings and a LG cell phone, of a value of at least seven hundred fifty dollars." Section 570.030.5 provides that stealing is a class D felony if the value of the property is $750 or more, and 570.030.8 provides that stealing is a class A misdemeanor if no other penalty is provided in the statute. No other penalty is provided if the property is valued at less than $750, other than a class D misdemeanor if the property has a value of less than $150. Section 570.030.7.

At the conclusion of the State's case, the defense moved for judgment of acquittal. The prosecutor stated she intended to submit an instruction for the lesser included offense of misdemeanor stealing. With respect to Count IV, the felony stealing charge, defense counsel argued that, even in the light most favorable to the State, the evidence of the value of the phone and jewelry did not surpass the felony threshold of $750.

> DEFENSE COUNSEL: So regarding the stealing, I don't think that any reasonable jury could find for the State on that matter. We are asking for a judgment of acquittal that has nothing to do with submission of instructions on lesser includeds.
> ….
>
> THE COURT: All right. Does the State have anything else with regard to that?
>
> PROSECUTOR: No. Just that the defendant, by being on notice of the charges here, is on notice of all the lesser included offenses and do obviously, the – that's what the State is presenting here in court today.
>
> THE COURT: … I'm going to sustain the motion as to Count 4, the stealing.

---

[2] All statutory references are to RSMo 2000 as supplemented through the date of the crime unless otherwise stated.

18

The defendant did not present any evidence and immediately rested. The defense then moved for

a judgment of acquittal at the close of all evidence. The court ruled:

> THE COURT: All right. Again, same ruling, Now at the close of all the evidence I'm going to deny the defendant's oral motion with they will follow up with a written motion as to Counts I, II, III, V, and VI. I'll sustain that motion as to Count IV, the stealing at, now, the close of all evidence.
>
> PROSECUTOR: Your honor, am I interpreting that to mean that we can not submit the lesser included offense on Count IV?
>
> THE COURT: Yes.

The parties had an informal instructions conference off the record and then came back on the record

to discuss the upcoming closing arguments. The following occurred:

> PROSECUTOR: The second issue, Your Honor, and it's going to depend on the court's ruling as it related to the Count IV, but should the court determine that either the decision – the ruling still stands or the court can't change its ruling for some reason, then it's our position that we not be precluded from arguing the evidence as its come in in trial, which might overlap with evidence of the stealing because obviously, all of these facts surrounding this jewelry in this case and this victim's phone in this case, the phone goes toward another count, tampering with physical evidence, but all the facts surrounding the jewelry are obviously germane to the other counts that the defendant's charged with in this case…
>
> DEFENSE COUNSEL: I can short circuit this quickly. At least – although you might not have stated it explicitly, Judge. The defense certainly understood the ruling as to Count IV having to do with the State's failure to provide evidence of a sufficient amount of loss. That is irrelevant now. I can't imagine the State's going to argue the amounts anyway. But yeah, obviously, they're going to be able to argue recent possession of stolen property as some indication that it was taken and it's taken from the home of the deceased person….
>
> THE COURT: All right. Let me add one more little wrinkle in that matter. And, again, this is for the sake of discussion and only assuming I don't change my mind. I'm not saying I won't because I am going to consider it, but if I didn't change my mind by way of argument for defense purposes, I would preclude them arguing to the jury that I have found in favor of defense in Count IV.

Court recessed for the day. The next day, court reconvened and the instructions conference took

place. The State proffered an instruction for misdemeanor stealing. The defense objected because

the trial court had sustained the motion for acquittal with respect to that charge. The trial court stated in part:

> I am going to say that the court did – we did have quite a discussion about this yesterday, and the court was asked to reconsider its decision by way of its ruling of allowing the State to instruct on the misdemeanor.
>
> And pursuant to statute RSMo 556.046(3), as well as *State v. Williams*, 708 S.W.2d 705, the court has reconsidered its position and is going to allow the State to submit on the misdemeanor of stealing believing that if there is a possible – possibility of acquittal on the felony stealing that all other elements for a misdemeanor stealing have – are at least submissible to the jury for consideration. So that is the court's basis for allowing Instruction 21.

Defense counsel also objected to the verdict director for misdemeanor stealing on the same grounds. The objection was overruled for the same reasons. Misdemeanor stealing was submitted to the jury, and it returned a guilty verdict.

On appeal, Russell relies on *Barnes v. State,* 9 S.W.3d 646 (Mo. App. E.D. 1999). In *Barnes,* the defendant was tried on charges of first degree murder and armed criminal action. *Id.* at 647. At the close of the state's evidence, the defendant offered a motion for judgment of acquittal. *Id.* The trial court sustained defendant's motion as to the charge of first degree murder. *Id.* at 647–48. In addition, the trial court reserved the right to review further case law on the motion. *Id.* at 648. After further evidence was presented, the trial court denied the defendant's motion by crossing out "sustained" which had previously been written on the motion. *Id.* The defendant was subsequently convicted on both counts. *Id.* at 647. The defendant appealed contending that a final judgment of acquittal occurred when the trial court sustained the motion. *Id.* at 650. The appellate court agreed, holding the double jeopardy clauses of the United States and Missouri constitutions barred later prosecution after the trial court's final judgment of acquittal. *Id.* at 649–52. The court remanded for a retrial on the lesser included offenses of the charge of first degree murder. *Id*. at 651-52.

20

Citing *Barnes*, Russell argues that the trial court first acquitted him of the class D felony of stealing. He asserts that the trial court then acquitted him of the lesser included offenses of stealing. Thus, he claims that his conviction for misdemeanor stealing was in violation of the double jeopardy clause.

The State agrees that Russell was acquitted of felony stealing. It argues, however, that Russell was never acquitted of misdemeanor stealing. The State characterizes the discussions regarding the submission of the misdemeanor stealing claim as one involving jury instructions and not acquittals. The State notes that defense counsel did not argue that Russell had been acquitted with respect to misdemeanor stealing in the motion for a new trial. Instead, the motion states:

> The trial court erred in submitting Instruction No. 21, the verdict director for misdemeanor stealing in Count IV, as the Court had already sustained defendant's Motion for Judgment of Acquittal as to Count IV, *felony stealing*, *due to insufficient evidence of the value of the property purportedly stolen.* An acquittal is a final judgment on the merits, not an opportunity for the prosecution to resubmit a lesser charge for the jury's consideration. In allowing the State a second bite at the apple, *after a verdict of acquittal*, the Court violated the Double Jeopardy Clause [and due process and fair trial rights].

(Emphasis added).

All parties agree that the trial court acquitted Russell of felony stealing. If the trial court did not acquit Russell of misdemeanor stealing, then submission of misdemeanor stealing was proper. *Barnes*, 9 S.W.3d at 651-52. If the trial court did acquit Russel of misdemeanor stealing, then Russell's conviction for misdemeanor stealing violated the double jeopardy clause. *See id.* at 649-52.

The defense only ever sought an acquittal of the felony stealing. It explicitly based its motion for acquittal on the value of the stolen property. In explaining why it was allowing the

submission of misdemeanor stealing after not allowing it, the trial court referenced section 556.046(3). That section pertains to jury instructions for lesser included offenses and states:

> The court shall be obligated to instruct the jury with respect to a particular included offense only if there is a basis in the evidence for acquitting the person of the immediately higher included offense and there is a basis in the evidence for convicting the person of that particular included offense.

The trial court also cited *State v. Williams*, 708 S.W.2d 705, 708 (Mo. App. E.D. 1986), which discussed section 556.046 and held that a "trial court errs if it does not instruct on all lesser included offenses supported by the evidence."

Our thorough review of the record reveals that the trial court acquitted Russell of felony stealing as alleged in Count IV. The trial court was then apparently uncertain whether it could submit the lesser included offense of misdemeanor stealing after having acquitted on felony stealing. After researching the issue, the court determined it could instruct on misdemeanor stealing and did so. This was not error.

The point is denied.

## Point V

In his fifth point on appeal, Russell argues the trial court erred in entering judgment on the verdict for Count VI which was for felony tampering with physical evidence. He states that the State failed to prove his guilt beyond a reasonable doubt. Russell claims the evidence did not establish that the concealment or destruction of Victim's cell phone impaired or obstructed the prosecution of the charged homicide. He maintains that the felony conviction must be changed to a misdemeanor conviction and that that this court should remand for resentencing.

"[W]e review a challenge to the sufficiency of the evidence by considering whether the evidence was sufficient for a rational factfinder to find each of the essential elements of the

22

crime beyond a reasonable doubt." *State v. Patterson*, 489 S.W.3d 907, 912 (Mo. App. W.D. 2016).

"[A]ll evidence favorable to the State is accepted as true, including all favorable inferences drawn from the evidence, and [a]ll evidence and inferences to the contrary are disregarded." *Id.* (internal quotation marks omitted).

> Section 575.100 states:
>
> 1. A person commits the offense of tampering with physical evidence if he or she:
>
> (1) Alters, destroys, suppresses or conceals any record, document or thing with purpose to impair its verity, legibility or availability in any official proceeding or investigation; or
>
> (2) Makes, presents or uses any record, document or thing knowing it to be false with the purpose to mislead a public servant who is or may be engaged in any official proceeding or investigation.
>
> 2. The offense of tampering with physical evidence is a class A misdemeanor, unless the person impairs or obstructs the prosecution or defense of a felony, in which case tampering with physical evidence is a class E felony.

The elements of the felony offense of tampering with physical evidence in the context of this case are (1) the destruction, suppression, or concealment of Victim's phone, (2) with purpose, (3) to impair its availability in an investigation, and this tampering (4) resulted in the impairment or obstruction of a prosecution or defense of a felony. *See Patterson*, 489 S.W.3d at 912.

> As to the fourth element, which increases the crime's penalty, Missouri courts have recognized and embrace the principle … that [o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

*Id.* (internal quotation marks omitted). Russell only argues that the fourth element was not proven by sufficient evidence. He does not contest the evidence supporting the first three elements.

Defense counsel argued that Russell and Victim were not strangers who lived near one another but instead were in a secret relationship. Defense counsel argued that the evidence could

23

support a finding that Russell engaged in consensual sex that involved choking for sexual pleasure and that Victim accidentally died. Defense counsel conceded that, after Victims death, Russell did not call for help but instead took Victim's car, phone, and jewelry.

Even though Victim's cell phone was never recovered, evidence about phone calls and text messages was obtained from Victim's phone records. The State argued that the absence of messages between Victim and Russell proved that they were not in a relationship. Defense counsel argued that the two did not message one another because their relationship was secret. The records showed that on May 23, 2017, Victim called Russell and they spoke on the phone for over four minutes. Later that day, Russell made 13 phone calls to Victim. At least five of those calls went to voicemail. It is unclear whether the rest of the calls were answered or not. Russell blocked the calls when he made them so Victim would not have known who was calling. The longest call was 33 seconds long.

Joshua Clevenger, an officer with the Heart of America Regional Computer Forensics Laboratory, testified that physical cell phones "hold thousands and thousands of pages of data." It is sometimes possible to pull deleted data from cell phones. Cell phones contain phone calls, messages, internet search results, data from applications including social media sites, locations and data points, pictures, and other information.

Tim Fitzgerald, a detective with the Kansas City, Missouri Police Department testified that without a physical phone, law enforcement is unable to see the contents of text messages that were sent and received. A physical phone can also show messages that were not sent. There is no way to see the applications that are on a phone without the physical phone. Phone records give limited information when compared to the information that can be collected from a physical phone.

Detective Fitzgerald testified that law enforcement tracked Victim's phone after her death because they were trying to recover it.

During closing arguments, the State noted the abundance of evidence presented regarding cell phones. The State identified the evidence retrieved from Russell's physical phone that supported the allegations against him. The State argued that it did not have the opportunity to examine Victim's physical phone for further evidence because Russell took it.

Sufficient evidence was presented that Russell's concealment, suppression, or destruction of Victim's phone impaired or obstructed a prosecution or defense of a felony as required by section 575.100.2. The physical phone almost certainly would have yielded more in depth and insightful information in this case than the phone records alone did. The information contained in Victim's phone was highly relevant to the charges against him.

The point is denied.

**Point VI**

In his sixth point on appeal, Russell argues the trial court committed a clerical error in the judgment when it stated that he was convicted of Count II which was first degree sodomy as an aggravated offense. He states that first degree sodomy was not submitted as an aggravated offense. The State concedes the merit of this point on appeal.

The grand jury indicted Russell for first-degree sodomy—aggravated sexual offense and charged that "the defendant for the purpose of arousing or gratifying the sexual desire of the defendant, knowingly had deviate sexual intercourse with [Victim], by the use of forcible compulsion, and in the course thereof the defendant inflicted serious physical injury on [Victim]." "Aggravated sexual offense" is defined, *inter alia*, as "any sexual offense, in the course of which, the actor: (a) Inflicts serious physical injury on the victim[.]" Section 566.010(1). The range of

25

punishment for first-degree statutory sodomy is five years to life imprisonment. If, however, the jury finds that it was an aggravated sexual offense, the range of punishment is ten years to life imprisonment. MAI-CR 4th 420.12, Notes on Use 3.

Instruction No. 13 was the verdict director which submitted first-degree sodomy; it did not include the language for first-degree sodomy as an aggravated sexual offense. Consistent with MAI-CR 4th 420.12, the jury was instructed in relevant part:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about May 31, 2017, in the State of Missouri, the defendant knowingly had deviate sexual intercourse with [Victim] by penetrating the anus of [Victim] with his penis, and

Second, that defendant did so by the use of forcible compulsion, then you will find the defendant guilty under Count II of sodomy in the first degree.

Note on Use 3 to MAI-CR 4th 420.12 state:

This instruction does not hypothesize sodomy in the first degree as an aggravated sexual offense.
If punishment enhancement allegations have been included in the charge and are supported by the evidence, then this instruction must be modified to submit the alleged conduct to the jury for a finding or findings beyond a reasonable doubt.

(Emphasis in original). There was no discussion at the instruction conference of submitting the count as an aggravated sexual offense. Given all of this, the State agrees that the record demonstrates that Russell was convicted of first-degree sodomy, but without the minimum sentence enhancement authorized for an aggravated sexual offense.

At sentencing, the State referenced the brutality of the crime of first-degree sodomy but did not assert that Russell was found to have committed an aggravated sexual offense. The trial court noted "my job here is to sentence the defendant according to law and to the verdicts as rendered by the jury and I will do that." The court's oral pronouncement on the sodomy count

26

was as follows: "As to Count II, sodomy in the first degree, I'm going to sentence the defendant to life in the Missouri Department of Corrections." The trial court did not state that it was sentencing Russell for first-degree sodomy as an aggravated sexual offense.

The written judgment and sentence, however, mistakenly provides that Russell was convicted of Count II of first-degree sodomy as an aggravated sexual offense. It states the "Charge Code & Description" of Count II as "566.060-002U20171199.0 *Disc.-Sodomy/Att-1st Deg-Agg S[.]" "Because a judgment derives its force from the rendition of the court's judicial act and not from the ministerial act of its entry upon the record, an oral sentence generally controls over an inconsistent writing." *State v. McGee*, 284 S.W.3d 690, 713 (Mo. App. E.D. 2009). Both Russell and the State agree that the judgment should have stated that Russell was convicted of first-degree sodomy without reference to it being an aggravated sexual offense.

"Clerical errors in the sentence and judgment in a criminal case may be corrected by an order *nunc pro tunc* if the written judgment does not reflect what actually was done." *State v. Lemasters*, 456 S.W.3d 416, 426 (Mo. banc 2015). "In a criminal case, Rule 29.12(c) allows the court to amend its records according to the truth, so that they should accurately express the history of the proceedings which actually occurred prior to the appeal." *Id*. (internal quotation marks omitted). We need not remand the case when we can appropriately correct the judgment. *McGee* 284 S.W.3d at 713. Accordingly, we correct the judgment to state that Russell was convicted in Count II of sodomy in the first degree without any reference to it being an aggravated sexual offense. Rule 30.23 ("Unless justice otherwise requires, the court shall dispose finally of the case.").

The point is granted.

27

## Conclusion

The judgment and sentence are corrected to delete the language regarding aggravated sexual offense with respect to Count II. The judgment is affirmed in all other respects.

_____
Anthony Rex Gabbert, Judge

All concur.